UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ERICA D. SANKEY-WALKER,

     Plaintiff,

v.                                   CASE No. 8:13-CV-2331-T-TGW

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

     Defendant.

_____

O R D E R

     The plaintiff in this case seeks judicial review of the denial of

her claim for Social Security disability benefits.[1] Because the decision of the

Commissioner of Social Security is supported by substantial evidence and

contains no reversible error, the decision will be affirmed.

I.

     The plaintiff, who was forty-three years old at the time of the

most recent administrative hearing and who has a master's degree, has

worked as a mental health social worker, substance abuse counselor, clinical

_____

     [1]The parties have consented in this case to the exercise of jurisdiction by a United
States Magistrate Judge (Doc. 17).

coordinator, and after-school teacher (Tr. 30, 51, 52). She filed a claim for Social Security disability benefits, alleging that she became disabled due to mental illness, back and neck problems, arthritis, seizures, ophthalmic migraines, posterior vitreous, mild bulging at C3-C6, chronic cervical thoracic lumbosacral strain, posttraumatic dizziness, chronic pain syndrome, and fibromyalgia (Tr. 389). The claim was denied initially and upon reconsideration.

The plaintiff, at her request, then received a de novo hearing before an administrative law judge. The law judge, on May 7, 2010, found that the plaintiff was not disabled (Tr. 173). However, on the plaintiff's request for review, the Appeals Council vacated the law judge's decision, and remanded the claim for further proceedings (Tr. 181-83).

Upon remand, the plaintiff received a de novo hearing before a different law judge. The law judge found that, through her date last insured of December 31, 2009, the plaintiff had the severe impairments of "right shoulder rotator cuff syndrome; chronic pain syndrome of cervical spine with mild bulging discs; fibromyalgia; and posttraumatic stress disorder and

adjustment disorder with depressed mood" (Tr. 18). He concluded further

(Tr. 20):

> Through the date last insured, the claimant had the
> residual functional capacity to perform light work
> as defined in 20 CFR 404.1567(b), except with an
> occasional limitation for bending, stooping,
> crouching, kneeling or lifting above shoulder
> height, but capable of performing routine tasks in
> and [sic] air-conditioned environment with limited
> stress and limited contact with the public.

The law judge determined that these restrictions prevented the plaintiff from

returning to her past relevant work (Tr. 30). However, based on the testimony

of a vocational expert, the law judge found that there are jobs that exist in

significant numbers in the national economy that the plaintiff could have

performed, such as mail clerk, office helper, and file clerk (Tr. 31). The law

judge therefore decided that the plaintiff was not disabled (id.). The Appeals

Council let the decision of the law judge stand as the final decision of the

Commissioner.

## II.

In order to be entitled to Social Security disability benefits, a

claimant must be unable "to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. 423(d)(1)(A). A "physical or mental impairment," under the terms of the Social Security Act, is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. 423(d)(3). In this case, also, the plaintiff must show that she became disabled before her insured status expired on December 31, 2009, in order to receive disability benefits. 42 U.S.C. 423(c)(1); Demandre v. Califano, 591 F.2d 1088, 1090 (5th Cir. 1979), cert. denied, 444 U.S. 952.

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence. 42 U.S.C. 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971), quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Under the substantial evidence test, "findings of fact made by administrative agencies ... may be reversed ... only when the record compels a reversal; the mere fact that the record may support a contrary

-4-

conclusion is not enough to justify a reversal of the administrative findings." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004)(en banc), cert. denied, 544 U.S. 1035 (2005).

It is, moreover, the function of the Commissioner, and not the courts, to resolve conflicts in the evidence and to assess the credibility of the witnesses. Grant v. Richardson, 445 F.2d 656 (5th Cir. 1971). Similarly, it is the responsibility of the Commissioner to draw inferences from the evidence, and those inferences are not to be overturned if they are supported by substantial evidence. Celebrezze v. O'Brient, 323 F.2d 989, 990 (5th Cir. 1963).

Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the court is not to reweigh the evidence, but is limited to determining whether the record as a whole contains sufficient evidence to permit a reasonable mind to conclude that the claimant is not disabled. However, the court, in its review, must satisfy itself that the proper legal standards were applied and legal requirements were met. Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988).

III.

The plaintiff attacks the law judge's decision on three grounds. The relevant evidence on those challenges is that which has a bearing on the plaintiff's condition between April 1, 2005, the alleged disability onset date, and December 31, 2009, the plaintiff's date last insured. That evidence does not sustain the plaintiff's challenges to the law judge's decision.

A. The plaintiff first argues that the law judge erred by failing to consider all of her impairments (Doc. 18, p. 14). Specifically, the plaintiff complains that the law judge did not evaluate properly her impairments of personality disorder, neuropathy in her feet, and fibromyalgia. This contention is meritless.

The plaintiff contends that the law judge "did not really consider the diagnosis of personality disorder in his decision except to state that [the plaintiff] could control her anti-social tendencies when she wanted to" (id., p. 15). The diagnosis on Axis II of a personality disorder was rendered by Dr. Tracey Henley following a consultative psychological evaluation on March 24, 2010, which was almost three months after the plaintiff's date last insured (Tr. 784). However, the plaintiff also underwent a consultative psychological

evaluation by Dr. Paul S. Suich on March 4, 2008 (Tr. 667). Dr. Suich diagnosed the plaintiff with posttraumatic stress disorder and adjustment disorder with depressed mood on Axis I and simply paranoid traits on Axis II (Tr. 670). The law judge accepted Dr. Suich's diagnoses of posttraumatic stress disorder and adjustment disorder with depressed mood (Tr. 18), and implicitly rejected Dr. Henley's Axis II diagnosis of Personality Disorder NOS, as well as her Axis I diagnosis of Depressive Disorder NOS.

Significantly, the law judge acknowledged Dr. Henley's diagnosis of Personality Disorder NOS (Tr. 25). Consequently, the law judge did not overlook that diagnosis. Rather, he did not accept it.

This conclusion is confirmed by the law judge's express rejection of the only marked functional limitation opined by Dr. Henley (Tr. 29). Thus, Dr. Henley concluded that the plaintiff had marked limitations in her ability to interact appropriately with the public and co-workers. However, the law judge found that conclusion "inaccurate." Moreover, he explained that finding in detail (id.). Consequently, the law judge considered the diagnosis of a personality disorder and reasonably rejected it.

In addition, in order to prevail on this contention, the plaintiff must show that she had functional limitations from her personality disorder that were not included in the law judge's determination of the plaintiff's residual functional capacity. No such showing was made.

The law judge found that the plaintiff had moderate difficulties in social functioning (Tr. 19). He accommodated that circumstance by restricting the plaintiff to "performing routine tasks ... with limited stress and limited contact with the public." In order to show that the law judge erred with respect to the diagnosis of personality disorder, she must point to evidence that compels greater functional limitations.

In this respect, "a diagnosis or a mere showing of 'a deviation from purely medical standards of bodily perfection or normality' is insufficient; instead, the claimant must show the effect of the impairment on her ability to work." Wind v. Barnhart, 133 Fed. Appx. 684, 690 (11th Cir. 2005), quoting McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986). In other words, it is the functional limitations that determine disability. Moore v. Barnhart, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005); McCruter v. Bowen, supra. Here, the plaintiff makes no effort to show how her personality

disorder created a specific mental limitation beyond the law judge's residual functional capacity, but simply refers to general characteristics of a personality disorder (Doc. 18, p. 15), a diagnosis the law judge did not accept. Consequently, for these reasons, the plaintiff did not demonstrate reversible error with respect to the diagnosis of a personality disorder.

The plaintiff next asserts that the law judge failed to mention the diagnosis of neuropathy in her feet, and he did not consider how that impairment might limit her (id., pp. 15-16).  In 2009, Dr. Victor Wright treated the plaintiff for pain in her feet.  Dr. Wright diagnosed bilateral neuropathy, noting that it was mostly on the left (Tr. 707).  He prescribed Lyrica (Tr. 706, 709-10).

Importantly, there is nothing in Dr. Wright's notes that adds anything significant. Thus, Dr. Wright did not even suggest that the plaintiff has any functional limitations due to her neuropathy.   Under these circumstances, Dr. Wright's treatment notes fall within the principle that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).

Regardless, the plaintiff's argument fails.  Thus, although the plaintiff asserts that neuropathy "could certainly limit" her ability to perform the standing and walking required for light work (Doc. 18, p. 16), there was no opinion in the record before the law judge from a treating or examining doctor that supports that assertion.

Furthermore, as the Commissioner points out, substantial evidence of record supports the conclusion that the plaintiff's neuropathy did not limit her ability to perform the walking requirements of light work (Doc. 19, pp. 6-7).  Thus, on a number of occasions, doctors, including the plaintiff's treating physician, noted that the plaintiff could walk without a problem (id., p. 6).  Further, an examining orthopedist, after stating that the plaintiff's gait was intact, opined that the plaintiff could walk up to eight hours in an eight-hour day (id., pp. 6-7).  Further, a non-examining reviewing physician concluded that the plaintiff could walk and stand for six hours in an eight-hour day (id., p. 7).  Accordingly, the plaintiff's speculation does not demonstrate an error regarding a foot problem.

Finally, the plaintiff challenges the law judge's assessment of her fibromyalgia (Doc. 18, p. 16).  The law judge recognized that the plaintiff

suffers from fibromyalgia and, in fact, found that the condition was a severe

impairment.

"Fibromyalgia is a condition characterized by widespread pain

in joints, muscles, tendons and soft tissues." Heppell-Libsansky v.

Commissioner of Social Security, 170 Fed. Appx. 693, 695 n.1 (11th Cir.

2006). The Eleventh Circuit has noted that the hallmark of fibromyalgia is

a lack of objective evidence. Moore v. Barnhart, supra, 405 F.3d at 1211. As

explained in Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996):

> Its cause or causes are unknown, there is no cure,
> and, of greatest importance to disability law, its
> symptoms are entirely subjective. There are no
> laboratory tests for the presence or severity of
> fibromyalgia. The principal symptoms are "pain all
> over," fatigue, disturbed sleep, stiffness, and – the
> only symptom that discriminates between it and
> other diseases of a rheumatic character – multiple
> tender spots, more precisely 18 fixed locations on
> the body (and the rule of thumb is that the patient
> must have at least 11 of them to be diagnosed as
> having fibromyalgia) that when pressed firmly
> cause the patient to flinch.

The court added that "[s]ome people may have such a severe case of

fibromyalgia as to be totally disabled from working ..., but most do not." Id.

at 307. The Seventh Circuit pointed out further that "[f]ibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist." Id.

The plaintiff argues that the law judge "merely listed fibromyalgia as one of her severe impairments and then ignored any possible limitations that it might cause" (Doc. 18, p. 16). Notably, the record does not appear to contain any diagnosis of fibromyalgia by a rheumatologist. Nevertheless, the law judge not only accepted the diagnosis, but found that it was a severe impairment.

Importantly, the plaintiff has the burden to show that she is disabled. However, the plaintiff points to no evidence suggesting that she has functional limitations from her fibromyalgia. See Moore v. Barnhart, supra; McCruter v. Bowen, supra. As previously explained, the plaintiff cannot carry her burden merely by referring to her diagnosis.

Moreover, substantial evidence supports the law judge's conclusion that the plaintiff retained the ability to perform light work despite her fibromyalgia. For example, Dr. James Patty, a non-examining reviewer, opined that the plaintiff could occasionally lift up to 50 pounds, frequently lift up to 25 pounds, and  sit or stand/walk for about 6 hours in an 8-hour

workday (Tr. 687). As the law judge discussed, the opinion of Dr. James Melton, a consultative orthopedist, "was consistent with the state agency finding that the claimant could perform light exertion with postural and environmental restrictions" (Tr. 30). Further, the plaintiff testified at the hearing that she was taking medication for her fibromyalgia, among other conditions, and she had "noticed a difference since [she had] been on that" (Tr. 58). Therefore, the plaintiff failed to show that the law judge erred with respect to fibromyalgia.

B. The plaintiff next complains that the law judge failed to properly assess the opinions of her treating neurologist, Dr. Robert Martinez, and an examining psychologist, Dr. Henley (Doc. 18, pp. 17-23). This assertion is without merit.

On March 24, 2010, Dr. Henley performed a psychological evaluation of the plaintiff (Tr. 782-84). As noted, Dr. Henley diagnosed the plaintiff with depressive disorder NOS and personality disorder NOS (Tr.

784).  Dr. Henley assigned the plaintiff a Global Assessment of Functioning

("GAF") score of 70 (id.), which reflects only some mild symptoms.[2]

In April 2010, about three months after the plaintiff's date last

insured, Dr. Henley completed a Medical Source Statement of Ability to Do

Work-Related Activities (Mental) (Tr. 785-87).  Dr. Henley opined that the

plaintiff's ability to understand, remember, and carry out instructions was not

affected by her condition, but the plaintiff had marked difficulties interacting

appropriately with the public and co-workers, moderate difficulties

interacting appropriately with supervisors, and moderate difficulties

responding appropriately to usual work situations and changes in a routine

work setting (Tr. 785, 786).  In response to a question about the date when the

limitations were first present, Dr. Henley said "deferred" (Tr. 786).  In other

words, Dr. Henley did not relate her opinions back to a period before the date

last insured.

---

[2]The GAF scale "[c]onsider[s] psychological, social, and occupational functioning
on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual
of Mental Disorders, (DSM-IV-TR) (4th ed., Text Revision), p. 34.  A rating of 61-70
reflects "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some
difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft
within the household), but generally functioning pretty well, has some meaningful
interpersonal relationships" (id.).

The law judge discounted Dr. Henley's opinion, stating (Tr. 29):

In terms of the claimant's mental impairments, as noted by the Appeals Council, there were times when she exhibited appropriate behavior and as noted above, she apparently did not get along with her multiple attorneys. However, the claimant had no mental health treatment and no doctor referred her to a mental health expert. Also, as noted by the Appeals Council, the claimant underwent a psychological evaluation in March 2010 by Dr. T. Henley who assigned a GAF of 70, which suggests mild symptoms or some difficulty in social or occupational functioning according to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR) (Exhibit 25F). Although Dr. Henley opined that the claimant had marked limitations with her ability to interact appropriately with the public and co-workers, the undersigned finds this inaccurate. Dr. Henley's opinion is not supported by the other objective medical evidence or even her own mental status evaluation. Therefore, this opinion deserves little probative weight. In fact, once the claimant was corrected for her "attitude", she became cooperative. Of importance, an earlier consultative evaluation in March 2008 by Dr. P Suich noted the claimant was initially very demanding and agitated at that examination, but then settled down and that examiner did not voice real concern because the claimant was able to control herself within a short period of time. Moreover, the claimant had seen several doctors in the past to include a neurologist and none suggested she get psychiatric treatment over the

years and she, apparently, was able to function in
a normal society without attracting the attention of
others or requiring treatment. Lastly, the claimant
was capable of getting along with others when she
elected to do so. She was able to attend church,
drive, go to the library and the grocery store. There
is no indication that her tendency to be
argumentative could not have been controlled
given her history of limited treatment. The
claimant has been able to live alone with her son
since her divorce for a number of years and was
able to obtain a Master's Degree attending classes
with other students who she had to interact with.
In short, the claimant was capable of being sociable
when she wanted to. Therefore, the undersigned
finds she had moderate limitations with social
functioning.

Furthermore, as a one-time examining consultant, Dr. Henley's

opinions are not entitled to the same weight as a treating physician. See

Crawford v. Commissioner of Social Security, 363 F.3d 1155, 1160 (11th Cir.

2004). The law judge's explanation would adequately support the

discounting of an opinion by a treating physician. A fortiori, it justifies the

discounting of an opinion by a one-time examining psychologist.

The plaintiff contends that both medical and non-medical

evidence of record supports Dr. Henley's opinions that she had marked

difficulties in getting along with the public and co-workers (Doc. 18, pp. 18-

20). In this connection, the plaintiff points to medical records noting bizarre and uncooperative behavior and her diagnosis of borderline personality traits. However, as previously explained, it is not sufficient for the plaintiff to argue that there is evidence that supports the opinion of marked difficulties in dealing with the public and co-workers. Rather, the plaintiff must identify evidence which compels such a finding. The plaintiff has not made such a showing.

Furthermore, my reading of the record reveals that most of the plaintiff's disagreements stemmed from her very strong desire to protect her privacy. That concern is not likely to cause significant problems at a job with routine tasks, limited stress, and limited public contact.

The plaintiff also notes that she had difficulty getting along with the first law judge assigned to her case. Frankly, my reading of the transcripts of the two hearings involving the law judge and the plaintiff reveals that the responsibility for the personality clash between the law judge and the plaintiff is not placed entirely on the plaintiff. Significantly, when the plaintiff had a further hearing before a different law judge, at which the plaintiff acted

properly, the law judge commented that the plaintiff was able to control herself and was polite (Tr. 19).

The law judge recognized that there were times when the plaintiff exhibited inappropriate behavior, but there were also times when the plaintiff was more cooperative. For example, the law judge explained that, during an examination with Dr. Suich, "the claimant was initially very demanding and agitated at that examination, but then settled down and that examiner did not voice real concern because the claimant was able to control herself within a short period of time" (Tr. 29). Further, August 2006 treatment records from Bartow Regional Medical Center state that the plaintiff "demonstrate[d] normal behavior appropriate for age and situation" (Tr. 565, 580). The law judge could therefore reasonably conclude that Dr. Henley's assessment of the plaintiff's ability to get along with the public and co-workers was inaccurate.

The plaintiff quibbles with the law judge's statement that "she became cooperative" after being corrected for her attitude by Dr. Henley, noting that Dr. Henley actually said "her level of cooperation improved somewhat, but she remained guarded" (Doc. 18, p. 19). Thus, the plaintiff

-18-

argues "[t]here is a difference between being cooperative, and having your level of cooperation improve somewhat" (id.).  Nevertheless, the law judge could conclude, as he did, that the plaintiff's attitude changed after being corrected by Dr. Henley.  Moreover, the fact that the plaintiff feels she needs to raise such a weak argument underscores the lack of merit in the challenge to the law judge's handling of Dr. Henley's opinion.

The plaintiff also challenges the law judge's reliance on Dr. Henley's assessment of a GAF score of 70, asserting that the GAF system is an "outdated and admittedly inaccurate measurement" that is no longer used by the American Psychiatric Association and has not been endorsed by the Commissioner (id., pp. 20-21).  As the Commissioner correctly responds, "the decision by the American Psychiatric Association to discontinue the use of GAF scores in the Fifth edition of the DSM in 2013 has little relevance to the inconsistency of Dr. Henley's report with her medical source opinion rendered in 2010" (Doc. 19, p. 10 n.3).  In other words, the law judge could reasonably consider Dr. Henley's own assessment of the plaintiff's GAF score in considering the weight to give to Dr. Henley's opinion.

The plaintiff further contends that, contrary to the law judge's statement, she has been referred for psychiatric treatment (Doc. 18, pp. 21-22). Importantly, however, the law judge also noted, and the plaintiff does not dispute, that she did not obtain mental health treatment. Under these circumstances, the law judge could reasonably conclude that the plaintiff's mental impairments were not as severe as the plaintiff alleged.

The plaintiff next complains that the law judge incorrectly said she was able to live alone, but she testified that she lived with her son and a roommate (id., p. 22). What the law judge actually said was "[t]he claimant has been able to live alone with her son since her divorce for a number of years ..." (Tr. 29). However, as the Commissioner persuasively argues, the plaintiff's ability to live with a roommate, who is her ex-husband, undermines the notion that she has difficulty getting along with others.

Finally, the plaintiff asserts that "[t]here is simply not enough information known about the Master's degree to use it as evidence that Dr. Henley's diagnosis and opinion was 'inaccurate'" (Doc. 18, p. 22). The plaintiff suggests that she may have earned this degree "in her early twenties, when she was functioning at a higher level, or it could have been earned

online, with little or no contact with others" (id.). This speculative argument also underscores the weakness of this challenge. In all events, the law judge articulated ample reasons for discounting Dr. Henley's opinion.

As indicated, the plaintiff also argues that the law judge failed to assess properly the opinion of her treating neurologist, Dr. Martinez (id., pp. 22-23). This contention is unpersuasive.

On February 2, 2009, Dr. Martinez's neurological impression was bulging disk at C3-C4-C5-C6; chronic severe cervical, thoracic, and lumbosacral strain; posttraumatic dizziness; chronic insomnia; chronic pain syndrome; and nonepileptic seizures, per Dr. Tatum (Tr. 701). Dr. Martinez stated, "In my opinion, this patient is 100% permanently, totally disabled, unable to work, function, or compete in a competitive job environment, not even sedentary activity" (id.). He indicated that the plaintiff should perform no jumping or bouncing exercises, but could do exercises for the neck and back, as well as walking and aqua therapy (Tr. 702). The plaintiff was "[n]ot to lift greater than 10 to 20 pounds from a bent position" (id.).

Dr. Martinez said that the plaintiff remained totally disabled on April 13, 2009, and on May 28, 2009 (Tr. 714, 719). On both occasions, he

-21-

restricted the plaintiff from jumping or bouncing exercises, jogging, basketball, volleyball, racquetball, horseback riding, soccer, and lifting more than 10 to 20 pounds from a bent position (Tr. 715, 720). In May, Dr. Martinez further said that the plaintiff should avoid lifting 10 pounds repetitively, but she could do walking, swimming, stationary bike riding, rowing exercises, yoga, Pilates, stretching exercises, and exercises on the elliptical and Stairmaster machines (Tr. 715).

Opinions from treating physicians should be given substantial or considerable weight unless there is good cause for not doing so. Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists when the treating physician's opinion is not bolstered by the evidence, the evidence supports a contrary finding, or the opinion is conclusory or inconsistent with the physician's own medical records. Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997).

The law judge considered the opinion of Dr. Martinez, but gave it little probative weight. Thus, the law judge explained (Tr. 29-30):

> As for the medical opinions, in September 2008 and February 2009, Dr. Robert Martinez indicated the claimant was 100% disabled from even

sedentary exertion due to chronic cervical, thoracic and lumbar strain and a mild bulging at C3-C6 levels. Dr. Martinez's opinion is not supported by the objective medical evidence or even his own progress notes. In fact, Dr. Martinez noted a normal gait, normal sensory testing and motor strengths were 5/5. Dr. Martinez, to the contrary, limited the claimant to lift 20 pounds occasionally and 10 pounds frequently, which is consistent with the performance of light work. Therefore, this opinion deserves little probative weight (Exhibits 15F and 16F). Dr. Patterson and Dr. Newman on the other hand, found no limitations. Moreover, in April 2010, consultative orthopedist Dr. Melton's opinion was consistent with the state agency finding that the claimant could perform light exertion with postural and environmental restrictions (Exhibit 24F). Even in May 2011, the claimant sought emergency room care at Bartow Regional Medical Center for complaints of abdominal pain, but her musculoskeletal physical examination showed normal joint range of motion with no swelling or deformities. No motor or sensory deficits were noted (Exhibit 39F).

These reasons support the law judge's decision to discount Dr. Martinez's opinion. Moreover, Dr. Martinez's opinion that the plaintiff "is 100% permanently, totally disabled, unable to work, function, or compete in a competitive job environment, not even sedentary activity" is not even a medical opinion, but rather opines on a vocational issue reserved to the

Commissioner.  20 C.F.R. 404.1527(d); <u>Lanier</u> v. <u>Commissioner of Social</u>
<u>Security,</u> 252 Fed. Appx. 311, 314 (11th Cir. 2007).

 The plaintiff contends that "[t]he reason that Dr. Martinez gave
for finding [the plaintiff] disabled was the fact that she was unable to do
anything on an uninterrupted basis.... She stated that she takes breaks several
times a day and needs to lie down two or three times a day.... This is not
inconsistent with the ability to lift 20 pounds occasionally and 10 pounds
frequently" (Doc. 18, pp. 22-23, <u>citing</u> Tr. 698). This argument is unavailing
for several reasons.

 In the first place, the Commissioner correctly responds that the
statements relied upon by the plaintiff are merely recitations of the plaintiff's
subjective complaints rather than an independent assessment of functional
limitations by Dr. Martinez (Doc. 19, p. 15).  Importantly, the law judge
found that the plaintiff was not fully credible (Tr. 28), and the plaintiff has
raised no challenge to that credibility determination.

 Moreover, the law judge could reasonably conclude that Dr.
Martinez's opinion of total disability is inconsistent with his treatment notes.
Thus, Dr. Martinez indicated that the plaintiff could lift 20 pounds

occasionally and 10 pounds frequently, which, as the law judge explained, is consistent with light work (Tr. 30). In addition, in May 2009, Dr. Martinez said that the plaintiff could do walking, swimming, stationary bike riding, rowing exercises, yoga, Pilates, stretching exercises, and exercises on the elliptical and Stairmaster machines (Tr. 715).

In addition, the law judge considered the findings and opinions of several other doctors and found them more persuasive than Dr. Martinez's extreme opinions (Tr. 30). It was clearly reasonable for the law judge to do so.

Consequently, the law judge provided good cause for discounting Dr. Martinez's opinion.

C. For her final issue, the plaintiff contends that the law judge "substituted his opinion for that of the medical experts in this case" (Doc. 18, p. 23). In this connection, the plaintiff asserts that the law judge "does not have the training and expertise to determine that the consulting psychologist's conclusions are inaccurate" (id., p. 24).

This contention completely misperceives the law judge's role as administrative fact-finder. It is the law judge's responsibility to weigh the

medical and non-medical evidence and determine whether the plaintiff is disabled. Thus, the regulations provide that the determination of the plaintiff's functional limitations in assessing the plaintiff's residual functional capacity is an issue reserved to the Commissioner. 20 C.F.R. 404.1527(d)(2). The law judge, therefore, did not substitute a medical opinion but instead performed his duty to assess the evidence in accordance with the regulations. 20 C.F.R. 404.1527.

It is, therefore, upon consideration

ORDERED:

That the decision of the Commissioner of Social Security is hereby **AFFIRMED**. The Clerk shall enter judgment in accordance with this Order and **CLOSE** this case.

DONE and ORDERED at Tampa, Florida, this 11 day of March, 2015.

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE